IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

BEVERLY J. McCOY                                                                    PLAINTIFF

v.                          Civil No. 05-3035

JO ANNE B. BARNHART, Commissioner,
Social Security Administration                                                      DEFENDANT

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, Beverly J. McCoy, brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration that her

disability ceased as of September 1, 2002. Both parties have submitted appeal briefs (Doc. 7 and

Doc. 8) and the court has the transcript of the social security proceedings.

## Procedural Background:

McCoy was found disabled and entitled to supplemental security (SSI) benefits effective

October 1, 1988, due to a seizure disorder (Transcript (hereinafter Tr.) 23, 53). Specifically, she

was found to have met the requirements of the listed impairment for seizure disorder. *See* 20

C.F.R. Pt. 404, Subpt. P, App. 1 § 11.02. Section 11.02 is met if the claimant has documented

epilepsy-major motor seizures (grand mal or psychomotor), including all associated phenomena,

occurring more frequently than once a month, in spite of at least 3 months of prescribed

treatments, accompanied by daytime episodes or nocturnal episodes manifesting residuals which

interfere significantly with activity during the day.

-1-

A continuing disability review conducted on December 6, 1996, found McCoy continued to be disabled. (Tr. 22). On September 26, 2002, a continuing disability review was conducted and it was determined McCoy was no longer disabled as of September 1, 2002. (Tr. 170-172). She ceased receiving benefits as of November 1, 2002. (Tr. 170-172).

McCoy requested reconsideration of this decision. (Tr. 185). Pursuant to this request, a hearing was scheduled before an administrative hearing officer for June 4, 2003. (Tr. 202). McCoy did not appear at the hearing. (Tr. 204 & 208). On June 16, 2003, the hearing officer found McCoy not to be disabled. (Tr. 208-216).

McCoy then requested a hearing before an ALJ. (Tr. 225). On May 11, 2004, a hearing was held. (Tr. 314-350). McCoy appeared and testified. (Tr. 319-332, 333-340, 342-343, 346-349). McCoy elected to proceed without counsel. (Tr. 316-317). Valda Enos, a friend of McCoy's, appeared and testified. (Tr. 332-333, 335-336, 340-342, 347-348). Sarah Moore, a vocational expert, also testified. (Tr. 343-346, 348).

On November 17, 2004, the ALJ upheld the decision to terminate benefits. (Tr. 8-21). The ALJ found McCoy had improved medically and the improvement related to her ability to do work. (Tr. 16). The ALJ concluded McCoy had no past relevant work. (Tr. 19). McCoy was found capable of performing all or substantially all of the requirements of work at any level so long as it did not involve unprotected heights, moving machinery, or driving. (Tr. 18-19).

McCoy requested a review by the Appeals Council. (Tr.6). On May 16, 2005, her request for review was denied. (Tr. 3-5).

AO72A
(Rev. 8/82)

## Evidence Presented:

At the administrative hearing held on May 11, 2004, McCoy testified she was thirty-eight years old and had completed the eleventh grade. (Tr. 319-321). McCoy testified she lived at home with her husband and nineteen year old son. (Tr. 321). She lives in a one-story house on more than an acre of land. (Tr. 326-327). She has a Chihuahua. (Tr. 327).

McCoy indicated she had never had a driver's license. (Tr. 321). She never applied for one because of her seizure disorder. (Tr. 322).

McCoy testified she takes Dilantin and Phenobarbital three times a day to control her seizures. (Tr. 324). With respect to her daily activities, McCoy indicates she straightens up the house a little and sweeps but doesn't do a lot of housecleaning because she doesn't like it. (Tr. 326 & 340). Once a week, she does the heavy cleaning including vacuuming. (Tr. 326 & 340).

She doesn't do much cooking. (Tr. 330). Normally her husband does most of the cooking. (Tr. 330). She will cook once in a while but only when her husband is there with her. (Tr. 330).

She is home alone most of the time. (Tr. 326). She watches television and occasionally listens to the radio. (Tr. 329). She likes to fish and she has flowerbeds in the yard. (Tr. 331).

She goes shopping if someone takes her. (Tr. 327). McCoy indicated her friend Val comes to the house and they study the Bible about once a week. (Tr. 329).

When asked when she last had a seizure, McCoy testified she could not remember. (Tr. 332). McCoy could not say how many seizures she had on the average. (Tr. 335). She stated there were times she was alone in the house and she would have them and no one would be around to tell her. (Tr. 335). When she has a seizure, she bites her tongue. (Tr. 332). After a

-3-

seizure, McCoy testified she has to lay down on the couch for the rest of the day or at least for several hours. (Tr. 346). Even then, McCoy indicated she is not really herself the next day. (Tr. 346).

When she was told she had been having seizures nearly every day for a week, McCoy did not make an appointment to see her doctor. (Tr. 336). However, she did the doctor about the seizures when she saw him. (Tr. 336).

McCoy testified Dr. Larry Jennings treats her for the seizures. (Tr. 333). She stated she saw him whenever she needed medication refills. (Tr. 333). McCoy testified she is compliant with her medication and takes it three times a day. (Tr. 335).

McCoy indicated she didn't work because of her seizures. (Tr. 339). She felt she could get hurt and people did not want to hire her because of the seizures. (Tr. 339).

Valda Enos testified she is McCoy's friend and tries to get out to McCoy's at least once a week. (Tr. 340). Enos indicated she had known McCoy since 1994. (Tr. 340).

Enos testified that McCoy had a seizure about three weeks prior to the hearing. (Tr. 332). When McCoy has a seizure, Enos does not call an ambulance or take McCoy to the hospital. (Tr. 332 & 342). Instead, she just tries to get McCoy to lie down for a while. (Tr. 332-333 & 342). Enos indicated McCoy and her husband had asked that if McCoy had a seizure that an ambulance not be called because they have a difficult time financially. (Tr. 347).

Enos has witnessed McCoy have about four seizures in the past year. (Tr. 333 & 342). Three different times when they were in town, McCoy had seizures. (Tr. 333 & 342). Enos testified McCoy had probably had six or eight seizures in the prior month. (Tr. 335). Enos stated she had talked to McCoy a couple of times on the phone when she'd had a seizure and

-4-

McCoy's husband had also stated that she had been having them every day that week. (Tr. 335). He also indicated she had been having several the last couple of weeks. (Tr. 336).

When asked what would keep McCoy from being employed, Enos responded that McCoy had a difficult time expressing herself. (Tr. 341). Enos also indicated that when McCoy gets nervous or tired she will have a seizure. (Tr. 341). Enos stated that McCoy get tired after about three hours of being gone from home and will have a seizure. (Tr. 341).

Enos also testified that after a seizure McCoy is very tired and a little dazed. (Tr. 347). The following day even, McCoy doesn't comprehend too much around her. (Tr. 347).

Sarah Moore, a vocational expert, was also called to testify. (Tr. 343). Moore was asked to assume for purposes of the hypothetical questions that they were talking about a person with the same age, chronological vocational and educational background as McCoy. (Tr. 343). The person did not have a limitation on exertional activities but was unable to be exposed to hazards. (Tr. 343).

Moore testified she interpreted hazards to include moving mechanical parts, heights, ropes, ladders, and scaffolds. (Tr. 344). Moore was also asked to include no driving, no use of a meat slicer, no using knives, no exposure to heat, and no exposure to a stove or to extreme temperatures. (Tr. 344-345). In Moore's opinion these limitations did not significantly erode the occupational work base that existed for unskilled labor. (Tr. 345).

If she assumed the person had a seizure at work on the average of one time a month, Moore stated this would impair the individual's ability to maintain gainful employment. (Tr. 345). Moore stated this person would not be able to maintain gainful employment without an accommodation by the employer. (Tr. 345).

-5-

The pertinent medical and vocational evidence in this case reflects the following. On February 6, 1989, McCoy underwent a general physical examination performed at the request of the Administration. (Tr. 99-106). She reported a history of seizure disorder or epilepsy since the age of fifteen. (Tr. 99). At the time of the examination, she was twenty-three. (Tr. 99). She had been taking Dilantin and Phenobarbital for five years and still having a seizure every ten to fourteen days without warning. (Tr. 99). No physical abnormalities were detected during her examination and her range of motion of her extremities and spine was within normal limits. (Tr. 100-105). The diagnoses were listed as: Epilepsy by history and seizure disorder (poorly controlled). (Tr. 105).

On March 7, 1989, Dr. Larry Jennings completed a treating physician's report for seizure disorder. (Tr. 140). He reported that McCoy had one to two grand mal[1] seizures a month with her most recent seizure having been about two weeks ago. (Tr. 140).

On March 10, 1989, Dr. Wendy Myers concluded McCoy's seizures met the level of frequency per the treating physician and lay statements submitted to meet listing 11.02A. (Tr. 107).

On June 12, 1996, McCoy completed a supplemental interview outline. (Tr. 48-52). She indicated she could bathe, dress, shave, and take care of her own hair care needs. (Tr. 48). She stated she could do laundry, dishes, change sheets, vacuum/sweep, take out the trash, and do home repairs. (Tr. 48). She indicated she could not iron because she might set the house on fire. (Tr. 48). She indicated she could shop for groceries or clothes and do the banking. (Tr. 48).

---

[1]"A grand mal seizure is characterized by a loss of consciousness with generalized tonic-clonic seizures. A tonic-clonic seizure is a spasm consisting of a convulsive twitching of the muscles." *Flanery v. Chater*, 112 F.3d 346, 347 N. (8th Cir. 1997)(citation omitted).

AO72A
(Rev. 8/82)

McCoy indicated she did not prepare meals other than sandwiches. (Tr. 49). Since her disability began, she indicated she could not pay bills or use a checkbook. (Tr. 49). She cannot drive and has no driver's license. (Tr. 49).

She does not use any assistive devices. (Tr. 49). She stated she spent her time watching television, listening to the radio, and visiting friends and relatives. (Tr. 49). She indicated she cannot work. (Tr. 49).

She indicated she suffered from unusual fatigue and had to rest two or more times a day for two to three hours a time. (Tr. 50). She stated she has seizures that last about an hour. (Tr. 50). She indicated she did not know how often she had the seizures or what activities or circumstances brought them on. (Tr. 50).

McCoy indicated nothing helped with the symptoms other then medication. (Tr. 50). She stated she took Dilantin and Phenobarbital three times a day. (Tr. 50). On an average day, McCoy indicated she cleaned house. (Tr. 51).

On November 5, 1996, Dr. Larry Jennings completed a treating physician's report for seizure disorder. (Tr. 139). He indicated McCoy had approximately four grand mal seizures per month with the most recent seizure having been two weeks ago. (Tr. 139).

On December 6, 1996, Dr. William F. Payne, a medical consultant, noted that McCoy's treating physician indicated that she had four major motor seizures per month. (Tr. 141). In view of this, Dr. Payne concluded McCoy met listing 11.02A. (Tr. 141).

Records indicate McCoy was seen at the Boston Mountain Rural Health Center, Inc., on the following dates: February 15, 1995; McCoy was seen by Dr. K. Henson. McCoy requested a recheck of her medication levels. She thought her Dilantin level might be high because she

AO72A
(Rev. 8/82)

was having trouble speaking clearly. (Tr. 136); July 21, 1995; McCoy seen by Dr. Larry Jennings. Complained of being more tongue tied lately and having more seizures this month than ususal. Will check blood levels, consider changing medication or referral to a neurologist. (Tr. 134); July 24, 1995; McCoy reports having a seizure that morning but she failed to take her medication last night. (Tr. 132); August 15, 1995; McCoy seen by Dr. Larry Jennings. McCoy complained of excessive sleepiness caused by increase dose of Phenobarbital at bedtime. Seizures have remained about the same as last visit. No acute changes. (Tr. 129); November 17, 1995; McCoy complains of hurting in the back/kidney area. Needs medications checked. (Tr. 126); December 11, 1995; McCoy called to report a single seizure over the weekend. (Tr. 125); June 14, 1996; McCoy seen by Dr. Larry Jennings. McCoy had a seizure yesterday observed by her daughter. Other than that she has not had any problems. Ovarian cyst. (Tr. 122); June 19, 1996; Blood taken to check medication levels. (Tr. 118); July 18, 1996; Blood taken to check medication levels. (Tr. 119); July 22, 1996; Dilantin dosage changed to 100 mg. a.m, 50 mg., at noon, and 100 mg., at night. (Tr. 119); July 29, 1996; McCoy complained of a "drunk" like feeling since Dilantin level lowered. (Tr. 117); August 6, 1996; Blood taken to check medication levels. (Tr. 115); September 11, 1996; McCoy had a grand mal seizure at 10 a.m. Blood taken to check medication levels. (Tr. 110); September 13, 1996; McCoy advised to decrease Dilantin in view of level in blood. (Tr. 110); September 23, 1996; Blood work. (Tr. 109); September 25, 1996; McCoy called and notified to up Dilantin level to 150 mg., twice a day and return in a week for a Dilantin level check. (Tr. 109); November 5, 1996; Blood work. McCoy reported having been unable to up the dosage of Dilantin to 150 twice a day because she had unbreakable 100 mg., capsules. McCoy continued to take 100 mg., tablets three times a day

-8-

and 30 mg. of Phenobarbital three times a day. A note indicates she was doing fine and reported no seizures. (Tr. 108); March 7, 2000; Check up and medication refills. Complaining of pelvic pain. (Tr. 244); March 17, 2000; Examination due to pelvic pain and irregular menses. (Tr. 245); April 7, 2000; Complaining of pain with intercourse. (Tr. 242); August 13, 2000; Blood work to check medication levels. McCoy will have seizures if she misses doses of medication. Patient doing well. Complaining of chronic diffuse tenderness in the abdomen. (Tr. 240); October 18, 2000; Complaining of pain with intercourse. (Tr. 239); January 25, 2001; Complaints of lower abdominal pain. Need blood level check on medications. (Tr. 274); January 3, 2002; Seen by Dr. Jennings. McCoy reported a seizure around Christmas time. Note made that she was compliant with her medications. Complaints of decreased sexual desire. (Tr. 267); September 11, 2002; Seen by Dr. Jennings. Complaining of moderately severe bilateral headache in the frontal area of her face. "She has a seizure disorder and it is stable." CT with contrast scheduled. (Tr. 261); September 17, 2002, Cranial CT unremarkable. (Tr. 263); October 11, 2002; Seen by Dr. Jennings. Follow-up and discussion of her disability having been terminated. Continuation of headaches and abdominal pain. (Tr. 255); November 6, 2002; Seen by Dr. Jennings. Low white blood count nondiagnostic. Overall doing well. Note was made that she had been to the emergency room for abdominal pain. (Tr. 253); January 6, 2003; There for pap smear and breast examination. Complaining of abdominal pain. (Tr. 235); January 13, 2003; Had a seizure today. Here to have papers filled out. Has continued to have fairly active seizures. She is having 6-8 a year. Her last seizure was about a week ago. Seizure control is suboptimal. She continues to have significant seizure disorder and is restricted on activities and driving. I feel she continues to qualify for disability. Complaining of a decreased sex drive. (Tr.

AO72A
(Rev. 8/82)

249 & 307); February 18, 2003; Results of endoscopy performed by Dr. Dyer. Normal esophagus; 3-5 cm pedunculated polyp in the body of the stomach; normal duodenum. (Tr. 311-313); July 25, 2003; Seen by Dr. Jennings. In for blood level medication check. Seizure disorder under adequate control. Complains of more back pain possibly related to an old fall. (Tr. 306); August 13, 2003, chest x-rays. Mild diffuse interstitial lung disease. This may be interstitial fibrosis. (Tr. 309); August 26, 2003; Seen by Dr. Sullivan. Complaining of knots under her left arm. (Tr. 305); March 18, 2004; Seen by Dr. Jennings. Three or four seizures reported since the last visit. Recommended that she see a neurologist. (Tr. 304); May 1, 2004; Seen by Dr. Sullivan. Complaining of burning with urination. (Tr. 303).

On February 6, 2001, McCoy was taken to Baxter Regional Medical Center emergency room by ambulance. (Tr. 228-234). McCoy had a seizure while at a Wal-Mart store. (Tr. 234). A witness reported McCoy suffered a possible grand mal seizure during which she lost consciousness. (Tr. 231-234). She was experiencing some mental cloudiness. (Tr. 229).

On May 29, 2002, McCoy completed a report of continuing disability interview. (Tr. 147-154). She noted that her treating physician was Dr. Jennings. (Tr. 148). She stated she had been hospitalized in Baxter Regional Hospital in 2001 due to a seizure she had at Wal-Mart. (Tr. 149). She indicated she had been treated and released. (Tr. 149).

McCoy indicated she did not have any problems with mobility or taking care of her personal needs and grooming. (Tr. 150). With respect to household chores, she stated she did the cleaning, cooking, and shopping as long as someone took her. (Tr. 151). With respect to daily activities, she stated she watched television, listened to the radio, fished, planted flowers, and visited with friends and relatives. (Tr. 151). She indicated she did not drive. (Tr. 151).

AO72A
(Rev. 8/82)

Notations were made that McCoy had slurred speech and difficulty recalling dates. (Tr. 155). McCoy had brought papers to the Social Security office for help in completing them. (Tr. 155).

On August 17, 2002, McCoy completed another supplemental interview outline. (Tr. 157-161). She indicated she could bathe, dress, shave, and take care of her own hair care needs. (Tr. 157). She stated she could do laundry, dishes, change sheets, iron, vacuum/sweep, and take out the trash. (Tr. 157). She indicated she could not shop for groceries or clothes, do the banking, or go to the post office because she did not drive. (Tr. 157).

McCoy indicated she prepared meals once a week including sandwiches, meats, vegetables, and desserts. (Tr. 158). Since her disability began, she indicated she could pay bills but could not use a checkbook. (Tr. 158).

She does not use any assistive devices. (Tr. 158). She stated she spent her time watching television, listening to the radio, visiting friends and relatives, and fishing. (Tr. 158). She indicated she could not work because no one would hire her. (Tr. 158).

She indicated she did not suffer from unusual fatigue but had to rest once a day. (Tr. 159). She indicated she had no pain or symptoms. (Tr. 159). She stated she took Dilantin and Phenobarbital three times a day. (Tr. 159). On an average day, McCoy indicated she cleaned house and watered the flowers when they needed it. (Tr. 160).

On August 27, 2002, Dr. Jennings completed a treating physician's report for seizure disorder. (Tr. 276). He indicated McCoy had grand mal seizures. (Tr. 276). With respect to frequency, he merely checked per month. (Tr. 276). In the past year, it was noted McCoy had

reported one seizure on January 3, 2002, and one seizure on August 26, 2002. (Tr. 276). Under date of most recent seizure reported was written "7-2002 (2 seizures reported)."

On September 2, 2002, McCoy completed a statement in support of her claim. (Tr. 162-163. She stated that when she had seizures she jerked, blacked out, and bite her tongue. (Tr. 162). After the seizure, she stated she had a bad headache, a sore tongue, and felt sore all over. (Tr. 162). She stated she had last had a seizure on July 4, 2002, when she had two seizures. (Tr. 163). Before that, McCoy indicated she had seizures in May of 2002. (Tr. 163). However, McCoy then stated she had two or three seizures in the past month and 12+ seizures in the past year. (Tr. 163).

Billy K. McCoy, a friend, also completed a statement as a person who had seen McCoy have seizures. (Tr. 164-165). He indicated he had seen McCoy have four seizures. (Tr. 164). The last seizure he witnessed had been in May of 2002. (Tr. 164). Prior to that, he had witnessed one in 2001. (Tr. 164). He stated the first thing he noticed is McCoy would have trouble concentrating and her movements would become jerky and uncontrolled. (Tr. 164).

He stated McCoy had two or three seizures in the past month and 12+ in the past year. (Tr. 165). He stated McCoy's husband helped her with medication. (Tr. 165).

Valda Enos, a friend of McCoy's, provided an undated statement. (Tr. 220). In it she states she had witnessed McCoy have seizures while they were shopping. (Tr. 220). Enos stated McCoy also had seizures at home and would fall down. (Tr. 220). Enos indicated McCoy was unable to drive. (Tr. 220).

AO72A
(Rev. 8/82)

Jeff McCoy, claimant's husband, also completed a statement. (Tr. 166-167). He indicated he had witnessed her have fifty to one hundred seizures. (Tr. 166). He indicated he had last since her have a seizure in July and before that it had been sometime in June. (Tr. 166).

When a seizure was coming on, he stated that the claimant jerked her arms around. (Tr. 166). He indicated she had two or three seizures in the past month and twenty or more in the past year. (Tr. 167).

Rick McCoy, a friend, also completed a statement. (Tr. 168-169). He stated he had witnessed McCoy have one seizure but he could not remember the date. (Tr. 168). He did not know how many seizures she had in the past month but believed she had several during the past year. (Tr. 169).

On September 26, 2002, Helen Rumpf, a vocational analyst, concluded McCoy retained the capacity for a partial range of medium work. (Tr. 175). Rumpf noted McCoy was restricted from working at unprotected heights or around dangerous machinery, operating automobiles, or carrying firearms, and could not dive. (Tr. 175). Rumpf concluded McCoy could perform jobs such as addresser, document preparer, microfilming, and tube operator. (Tr. 175).

On September 26, 2002, Dr. Linda Green, a medical consultant, completed a physical residual functional capacity assessment. (Tr. 281-288). No exertional, postural, manipulative, visual, or communicative limitations were established. (Tr. 282-285). On environmental limitations it was noted that McCoy should avoid hazards such as machinery, heights, etc., and could not drive. (Tr. 285). At the time, there was no treating or examining source statement regarding McCoy's physical capacities in the file. (Tr. 287).

On October 11, 2002, when McCoy was seen by Dr. Jennings, he noted:

-13-

She has severe Seizure Disorder. She continues to have seizures at home. She has not had any major recent seizures that have required hospitalization or medicine adjustment, but continues to have both mental and physical impairment because of her seizure disorder. Because of her past seizure disorder she has not worked in the past. She has no current skills and because of the seizure disorder has mild mental impairment. She has difficulty even with following simple directions and is very forgetful. Even we struggle at times with her providing a good reliable history.

(Tr. 255).

Dr. Jennings also wrote a letter in support of McCoy's claim for disability. (Tr. 257).

He stated:

I have been Beverly's private physician and primary care physician since 1994 until present. She has been seen on a fairly regular basis. She has severe Seizure Disorder. Certainly over the last year or so seizure control has been better, but she continues to report seizures at home. They have not been to the severity that we have adjusted medication, but I do feel that she continues to have substantial impairment because of her seizure disorder. I do not feel that her situation has improved to the point that her SSI disability should be terminated.

She has had a long history of Seizure Disorder. She has no recent work history. She continues to have seizure activity and in association has cognitive impairment that would make returning to the work force difficult or impossible for Beverly.

As her private physician and in consideration of the appeal, I would strongly recommend that she continue with her SSI disability and I do not feel that she is capable of employment at this time. Prognosis for improvement with her chronic problems are poor and more recently has had headaches that have been difficult to manage and unless response to treatment today we will plan further neurologic evaluation and referral to a neuro specialist.

(Tr. 257).

On January 22, 2003, McCoy completed a third supplemental interview outline. (Tr. 187-192). She indicated she could bathe, dress, shave, and take care of her own hair care needs.

(Tr. 187). However, she stated someone else had to be home whenever she took a shower. (Tr. 187).

She stated she could do laundry, dishes, change sheets, vacuum/sweep, take out the trash, and do home repairs. (Tr. 187). She indicated she could not iron because she might set the house on fire. (Tr. 187). She indicated she could shop for groceries or clothes if someone else took her to the stores. (Tr. 187). She stated she did not drive because of the risk of her having a seizure. (Tr. 187).

McCoy indicated she prepared meals three or four times a week including meats and vegetables. (Tr. 188). Since her disability began, she indicated she could pay bills but she stated that she got confused counting change. (Tr. 188). She stated she cannot drive because of the medication and the risk that she will have a seizure. (Tr. 188). She stated she used to walk but cannot any more. (Tr. 188).

She does not use any assistive devices. (Tr. 188). She stated she spent her time watching television, listening to the radio, reading, visiting friends and relatives, fishing, and doing light gardening. (Tr. 188). She indicated she cannot work because no employer would hire her. (Tr. 188).

She indicated she suffered from unusual fatigue and if she feels bad she rests all day. (Tr. 189). She stated she only had pain as a result of injuries she suffers as a result of her seizures. (Tr. 189). She stated she had eight seizures a week. (Tr. 189).

McCoy indicated nothing helped with the symptoms other then medication. (Tr. 189). She stated she took Dilantin and Phenobarbital three times a day. (Tr. 189). On an average day, McCoy indicated on a good day she cooks supper, works on her plants, and cleans house. (Tr.

-15-

190). On a bad day, all she can do is lay on the couch and rest while she watches a little television. (Tr. 190).

McCoy indicated she has to have people take her places and has to have people around if she is cooking or bathing. (Tr. 191). She stated the seizures cause her embarrassment. (Tr. 191). Because of this, she indicated she has stopping going some places. (Tr. 191).

On January 13, 2003, Dr. Jennings completed a treating physician's report for seizure disorder. (Tr. 248). Dr. Jennings indicated McCoy had experienced eight seizures in the past year. (Tr. 248). He stated the most recent seizure was a week ago and was accompanied by tongue biting, loss of consciousness, urination or defecation, postictal antisocial behavior, and convulsive seizure. (Tr. 248). He indicated McCoy was on Phenobarbital and Dilantin. (Tr. 248). He indicated he last examined her the day he completed the statement. (Tr. 248).

On January 22, 2003, McCoy also completed a statement in support of her claim. (Tr. 194-195). She indicated that right before she had a seizure her hands were shaky and she had problems getting words out. (Tr. 194). Next, she stated she passes out and then doesn't know what happens. (Tr. 194). Following a seizure, McCoy indicated she felt terrible, wanted to sleep, and didn't feel "at myself." (Tr. 194).

McCoy indicated her last seizure had been that morning. (Tr. 195). Before that, she had one three days ago. (Tr. 195). In January so far, McCoy indicated she had seizures three times. (Tr. 195). In the last year, she indicated she had more than twenty seizures. (Tr. 195). She indicated she had last seen her physician, Dr. Larry Jennings, on January 6, 2003. (Tr. 195).

Jeff McCoy, claimant's husband, submitted a statement in support of her claim. (Tr. 200-201). He indicated he witnessed a seizure about a month before and about a week before that.

-16-

(Tr. 200). He stated she had at least two seizures in the past month that he had seen and more than twenty seizures in the past year. (Tr. 201).

Billie McCoy and Rick McCoy, both friends, submitted statements in support of McCoy's claim. (Tr. 196-197, 198-199). Neither had witnessed a seizure since they had completed their prior statements in September of 2002.

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

After a claimant has been awarded SSI benefits, the Commissioner is required to review the case periodically to determine if there has been medical improvement in the claimant's condition and whether the improvement affects the claimant's ability to work. 20 C.F.R. § 404.1594. The decision to terminate benefits is reviewed to determine whether substantial

-17-

evidence supports the decision and whether the correct legal standards were applied. *Britton v. Sullivan*, 908 F.2d 328, 330 (8th Cir. 1990)(substantial evidence test applies to the termination of disability benefits).

A eight-step evaluation is used to review the question of whether the claimant's disability is continuing. 20 C.F.R. § 404.1594(f). The first step requires an analysis of whether the claimant is engaging in substantial gainful employment. If the claimant is, the claimant's disability has ended. Step two requires an evaluation of whether the claimant has an impairment that corresponds to a listed impairment. If the claimant has an impairment or combination of impairments that meets or exceeds a listed impairment, the claimant's disability is found to have continued.

At step three, it is determined whether medical improvement has occurred. Medical improvement is defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). The regulation further provides that "[a] determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s)." *Id.* If there has been a medical improvement as shown by a decrease in medical severity, the analysis proceeds to step four. If there has been no medical improvement, the analysis proceeds to step five.

At step four, it must be determined whether or not any medical improvement is related to the ability to engage in basic work activities. At this step, consideration is given to "whether or not there has been an increase in the residual functional capacity based on the impairment(s)

-18-

that was present at the time of the most recent favorable medical determination." 20 C.F.R. § 404.1594(f). If the medical improvement is not related to the claimant's ability to work, the analysis proceeds to step five. If the medical improvement is related to the claimant's ability to work, the analysis proceeds to step six.

At step five, if there has been no medical improvement or it is found that the medical improvement is not related to the ability to work, the ALJ must consider whether any of the exceptions apply. If no exceptions apply, the claimant's disability is found to continue.

At step six, if medical improvement is shown to be related to the ability to do work or if one of the first group of exceptions to medical improvement applies, the ALJ must decide if the claimant has a current impairment or a combination of all current impairments which are severe. If the impairments are not considered severe in nature, the claimant is no longer considered disabled.

At step seven, if the claimant's impairments are severe, the ALJ must assess the claimant's current ability to engage in substantial gainful activity. At this step, the claimant's residual functional capacity is assessed and a determination is made whether the claimant can still do work she has done in the past. If he can, the claimant's disability is found to have ended.

At step eight, the burden shifts to the Administration to show that there are other jobs existing in significant numbers in the national economy that claimant is able to make a successful vocational adjustment to considering her age, education, work experience and residual functional capacity. If the claimant can do other work, her disability will be found to have ended. If the claimant cannot do other work, her disability is found to have continued.

AO72A
(Rev. 8/82)

**Discussion:**

In this case, McCoy first argues the ALJ erred in relying on state agency personnel and the hearing officer's review of the medical evidence instead of performing his own independent review. In this regard, McCoy objects to the ALJ's incorporation of the summary of medical evidence contained in the hearing officer's decision. McCoy also contends the following records are missing from the transcript: pages 55 and 56 from the progress notes of the Boston Mountain Rural Health Center; a report allegedly received from the Community Medical Center on September 3, 2002; and the records from Calico Rock Hospital. McCoy maintains the Boston Mountain Rural Health Center and Community Medical Center records were utilized by the state agency disability examiner and the vocational analyst. (Tr. 170 & 175). Finally, McCoy argues no weight was given to a clinic note from Dr. Jennings dated October 11, 2002, or to a letter he wrote dated October 11, 2002, in which stated it would be difficult if not impossible for McCoy to return to work because of her cognitive impairments. (Tr. 255 & 257).  We find these arguments unavailing. The ALJ did not error merely because he incorporated by reference a summary of the medical records contained in the hearing officer's decision of June 16, 2003. (Tr. 15). It is clear from the ALJ's decision that he reviewed the records and applied the applicable regulations. As to the alleged missing evidence, no showing has been made that this evidence deals with McCoy's seizures (the impairment at issue) or would impact in anyway the decision of the ALJ. Nor is there any indication that there is insufficient evidence in the record to provide a basis for the decision of the ALJ. *See e.g., Tellez v. Barnhart*, 403 F.3d 953, 956-57 (8th Cir. 2005)(rejecting the argument that ALJ failed to fully and fairly develop record where there was no indication that ALJ felt unable to make assessment and his conclusion was

-20-

supported by substantial evidence); *Strongson v. Barnhart*, 361 F.3d 1066, 1071-72 (8th Cir. 2004)(ALJ must develop record fully and fairly to ensure it includes evidence from treating physician, or at least examining physician, addressing impairments at issue).

While it is true that Dr. Jennings indicated in October of 2002 that he believed McCoy was disabled and had severe seizure disorder, his progress notes do not document McCoy having frequent seizures, uncontrolled seizures, or even the need for medication changes during this time period. Additionally, Dr. Jennings completed a treating physician's report on January 13, 2003, and indicated McCoy had only had eight seizures in the past year. (Tr. 248). Dr. Jennings also noted there had been no medication changes necessary for a year. (Tr. 248). Dr. Jennings' opinion that McCoy is unable to work is not entitled to controlling weight. *See e.g., Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005)("A medical source opinion that an applicant is 'disabled' or 'unable to work' . . . involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight.").

Next, McCoy argues the ALJ failed to appropriately develop the medical record as to her ability to do basic work activities. Specifically, McCoy contends Dr. Jennings should have been asked to give his opinion regarding her ability to do work-related activities and about his statement that she had cognitive difficulties and residual effects following seizures. Without this additional evidence, McCoy contends there was no sound basis for a determination of her residual functional capacity (RFC).

We believe the ALJ properly evaluated McCoy's RFC. It is the ALJ's responsibility to determine a claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others and a claimant's own description of her

AO72A
(Rev. 8/82)

limitations. The ALJ found McCoy retained the capacity to perform work at all exertional levels not involving unprotected heights, moving machinery, or driving. (Tr. 18). In so doing, the ALJ found McCoy's allegations regarding the severity of her seizures and the degree of her functional limitations not to be supported by the medical evidence and to be exaggerated. *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001)(deference to ALJ's opinion is appropriate when ALJ explicitly discredits claimant and gives good reason for doing so). The ALJ pointed out numerous inconsistencies in the record between the reports regarding McCoy's seizure activity and her description of her ability perform daily activities.

Inconsistencies between McCoy's treatment records and her testimony were also considered. The "ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to contrary." *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002); *Black v. Apfel*, 143 F.3d 383, 388 (8th Cir. 1998)(upholding denial of benefits where no objective medical evidence supported claimant's subjective pain complaints). We conclude the medical evidence outlined above supports the ALJ's finding. *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001)(residual functional capacity while decided on the basis of all relevant evidence remains a medical question). It is clear from Dr. Jennings' progress notes and his treating physician statements that McCoy's seizures were being controlled by medication and the frequency of the occurrence of the seizures had decreased. *Compare* (Tr. 140 (physician's statement dated March 7, 1980–1 to 2 seizures a month); Tr. 139 (physician's statement dated November 5, 1996–4 seizures per month); Tr. 261 (progress note dated September 11, 2002–seizure disorder and "it is stable"); Tr. 253 (progress note dated November 6, 2002–overall doing well); Tr. 307 (progress note dated January 13,

-22-

2003–six to eight seizures a year); Tr. 248 (physician's statement dated January 13, 2003--eight seizures in the past year and last medication change a year ago)). Similarly, in their own statements completed on September 2, 2002, McCoy and her husband Jeff indicated she had her last seizure in July of 2002. (Tr. 163 & Tr. 166). McCoy then contradicted her own statement that her last seizure had been in July by indicating that she had two or three seizures during the prior month. (Tr. 163).

As noted above, medical improvement is defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). In this case, the ALJ properly considered the entire record. As the ALJ quite accurately pointed out, Dr. Jennings' opinion that McCoy was incapable of work was not consistent with other evidence of record including Dr. Jennings' own records. (Tr. 17-18).

Finally, McCoy contends the hypothetical question given to the vocational expert was defective as it did not include any reference to residual effects of seizures. Without including residual effects in his questioning of the vocational expert, McCoy contends the hypothetical questioning was defective.

We find that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. *See Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001)("A hypothetical question prosed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true."); *Haggard v. Apfel*, 175 F.3d 591, 595 (8th Cir. 1999)(holding an ALJ need not include additional complaints in the hypothetical not supported

-23-

by substantial evidence).  Accordingly, we find that the vocational expert's testimony constitutes substantial evidence supporting the ALJ's determination regarding McCoy's RFC.  *See Rose v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996)(testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

## Conclusion:

For the reasons stated, I recommend that the decision of the Commissioner be affirmed. **The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

Dated this 1st day of June 2006.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)